J. M. MILLER *et al v.* J. WARREN MILLER *et al.*

(No. 7032, 7032-A)

Submitted November 4, 1931.     Decided December 8, 1931.

*Henry W. Cherrington* and *Somerville & Somerville,* for appellant.

*Hogg & Hogg,* for appellees.

LIVELY, JUDGE:

In these two consolidated cases, plaintiffs below, J. M. Miller, John G. Miller and wife, Nora Baum Miller, sued to can-

cel for fraud two certain notes and deeds of trust securing them, namely, in the J. M. Miller cause, a note of $10,500, dated December 12, 1924, payable to defendant Ohio Valley Bank Company, and deed of trust securing its payment on J. M. Miller's real estate at Point Pleasant in Mason county; and in the John G. Miller and Nora Baum Miller cause, to cancel a note of $5,500, signed by them, dated December 12, 1924, and payable to defendant bank, secured by trust deed on the makers' real estate in said city of Point Pleasant. The chancellor found fraud on the part of the bank and its agents in securing the execution of these notes and cancelled them and the trust deeds securing them. The bank appeals.

The two causes are similar and depend upon the same evidence, and were heard together with agreement that the evidence in each suit should be read as a part of the other. For what purpose and under what circumstances were these notes and trust deeds executed?

For many years prior to the execution of the notes, one Frank Miller, now deceased, a brother of plaintiff, J. M. Miller and uncle of plaintiff, John G. Miller, conducted a general produce business at Gallopolis, Ohio, about 4 miles from Point Pleasant in West Virginia. His brother, plaintiff J. M. Miller, was engaged in a like business in the latter city. Close brotherly and business relations existed between them. Frank Miller died and was succeeded in the conduct of the business in Ohio by his son, J. Warren Miller, and the same close relations continued. J. Warren Miller, in Ohio, purchased from plaintiff, J. M. Miller, in West Virginia, practically all the produce which the latter had to sell, and sold to him (J. M.) such seeds and feed stuff needed by him at Point Pleasant. Later, plaintiff, John G. Miller, entered into his father's business at Point Pleasant and it was conducted as J. M. Miller & Son, and the same business relationship continued.

In 1921, J. Warren Miller incorporated his business as the Miller Produce Company with capital stock of $100,000, divided into 1,000 shares of the par value of $100 each. This corporation absorbed competing produce companies at Gallipolis. Some of the stockholders were Miller Bros. (produce

dealers not connected with litigants), Gill Produce Company and S. H. Eagle, president of defendant bank, and Henry Cherington, a director of the bank. In 1923, about two years after the formation of the corporation, J. Warren Miller bought out all of the other stockholders except the firm of A. M. Grover & Son, which owned fifty shares, and he became the owner of 950 of the 1,000 shares of capital stock. He did not have money enough to pay for this stock (bought at $125 per share), and executed his notes to various stockholders, among whom was S. H. Eagle, to whom he gave a note for $31,000, secured by the stock as collateral, which note was reduced to $20,000 in fifteen months' time. The corporation owed to the bank a note of about $20,000 which was secured by trust deed on the real estate of the corporation, valued at fifty or sixty thousand dollars, executed in September, 1924. It did practically all of its banking business in the defendant bank, and frequently made overdrafts. This $20,-000 note to the bank, and the varying overdrafts seem to have been the extent of the corporation's indebtedness. J. Warren Miller began to search for money. He had purchased more stock than he could pay for, and at the time of his purchase of the stock in October, 1923, he approached his uncle, plaintiff J. M. Miller, and obtained a note from him, secured by the same real estate here involved, which he, J. Warren, pledged as collateral to a $5,000 note given to W. E. Spear in payment of fifty shares of stock purchased from Spears; at the same time, he also obtained a note of $5,000 from his cousin, John G. Miller and Nora Baum Miller, his wife, secured by trust deed on their real estate in Point Pleasant, the same real estate here involved, and pledged that note as collateral to a $5,000 note executed to Miller Bros. for stock in the corporation. These notes were paid when due and returned, together with the trust deeds securing them, to the makers, the Millers at Point Pleasant. No consideration was paid for these two notes executed by the Point Pleasant Millers and payable to J. Warren Miller. They were simply accommodating him with their credit. J. Warren also borrowed several thousand dollars from defendant bank, which loans were secured by his personal collateral. His next step to

raise money was on September 10, 1924, when he obtained J. M. Miller's note for $5,000, secured by trust deed on property involved. No consideration was paid for this note. Later, in October or November, 1924, he says, by a statement in writing, not sworn to, that he approached the plaintiffs with the purpose of interesting them in the corporation by purchase of its stock, and with the further purpose of having John G. Miller, the younger Miller, to come to Gallipolis to assist in the management of the corporation. His statement is that they agreed to purchase the stock, but not having money to pay therefor agreed to give their notes, secured by trust deeds on their respective properties, to complete the transactions. He then laid the matter before the bank to see if it would make the loan direct, advising it of the arrangement. The bank had the property offered as security inspected by its president and cashier and agreed to make the loan of the money direct to plaintiffs. The notes involved were then executed as of December 12th, the trust deeds bearing the same date and acknowledged on December 13th, before a notary of Mason county. The certificates of stock in the corporation (80 shares to J. M. Miller and 48 shares to John G.) were also dated December 12th. J. Warren Miller advised Henking, the bank's cashier, that the papers and stock certificates had been made out, and asked him to go with him on the following day, December 18th, to Point Pleasant to complete the transactions. On the morning of the December 18th, J. Warren could not go by reason of other duties, and requested Henking to go alone. Henking went, delivered the stock certificates and certificates of deposit for the amount of the notes, also the $5,000 note of J. M. Miller, bearing date September 10, 1924 (for which no consideration had been paid), with the trust deed securing it. The certificates of deposit were indorsed by plaintiffs, respectively, and turned over to Henking and delivered by him to J. Warren who deposited them to his credit in the bank, and then transferred the money to the corporation's account. The stock certificates were signed by plaintiffs and attached to their respective notes as collateral. The notes were made payable to the bank, and the trust deeds securing them were delivered to

Henking. These are the transactions leading up to the execution of the notes, as shown by the unsworn statement of J. Warren, and by the evidence of the president and cashier of the bank, and indicate the purposes for which they were given. About August, 1925, the Miller Produce Company went into bankruptcy. Evidently J. Warren Miller, who owned all but fifty shares, had incurred more indebtedness than he could pay, and the corporation, although doing a good business, could not meet all the burdens cast on it by him. After the failure, interest was paid and partial payments made by plaintiff on the notes until sometime in 1927, when they defaulted, and the trust property was advertised for sale, which brought about these suits to cancel the notes and trust deeds for alleged fraud on the part of the bank, at or before the time they were executed. The fraud alleged in the bill and amended bills, is that Henking represented to plaintiffs before the papers were prepared that J. Warren Miller did not owe the bank any money; that the corporation (Miller Produce Company) did not owe the bank, and that the stock in the corporation was worth $25.00 a share above par, and would pay 20% dividends. It is charged that these representations were false, and that plaintiffs relied upon them as true, and never would have executed the notes and trust deeds if such representations had not been made. Plaintiffs all say, together with Waldo Miller, a son of J. M. Miller, that Henking, the cashier, came to their place of business in Point Pleasant before they agreed to make the loans to J. Warren Miller and made these representations; that they relied upon them, and would not have pledged their credit to assist J. Warren had they known that he, or his corporation which he controlled, was indebted to the bank. They say that J. Warren came to them in December, 1924, and wanted them to assist him with their notes; that they refused to do so, the younger Miller testifying that J. Warren was getting behind with his payment for produce sold him, and he had some doubt that all was well; that when Henking came to them with the above representations and proffered to make the loan from the bank, all for assistance to J. Warren, they agreed; that they did not buy stock and wanted no interest in the business, all of which

they had primarily made plain to J. Warren. Militating against their position that they did not buy stock is the fact that the stock (80 shares to J. M., and 48 shares to John G. and Nora Baum) was issued in their names, respectively, and transferred by them as collateral security to the payment. of their notes; on the other hand, they are sustained in the assertion of non-purchase, because the note of $10,500, executed by J. M. is for $500 more than the alleged purchase price of the stock; and the note of $5,500 of John G. is $500 less than the alleged purchase price of his stock. Plaintiffs all say that the shares of stock were not delivered to them but were kept by Henking who directed them to sign where he indicated, and they thought the stock belonged to J. Warren, and that it was a formal procedure by which the latter's stock was pledged as additional security, as he had theretofore done when they gave him the previous notes. Henking denies he ever had any conversation with plaintiffs except when the transaction was closed on December 18th, and denies that he was previously in their place of business. It will be noted that the papers were prepared on December 12th. The deeds of trust, notes, and stock bear that date, but the matter was closed on December 18th, the date of the certificates of deposit for the amount of the notes which were then indorsed over, and by Henking later delivered to J. Warren. Henking says that J. M. asked him on December 18th, if J. Warren was indebted to the bank, but that he (J. M.) talked so continuously that he (Henking) did not have an opportunity to answer the question. The trial chancellor gave credence to plaintiffs' testimony, and has found that Henking fraudulently and knowingly misrepresented the true financial condition of J. Warren, and that plaintiff relied thereon. We are not disposed to reverse this finding of fact. Why should the bank be solicitous in making these loans to plaintiffs? It appears that J. Warren was not only heavily indebted to the bank and several of his former stockholders, including $20,000 to the president of the bank, but that the corporation was also indebted to the bank for $20,000, which the bank saw fit to secure by deed of trust on all its property two or three months before these alleged misrepresentations

were made, and also that on the 12th day of December, when the notes and deeds of trust were dated, it was carrying an overdraft of the corporation for $13,721.25. This overdraft was $14,166 on December 13th, had increased to $14,721.34 on the 15th of December, and on the 18th of that month, amounted to $15,573.13. On the day following, the overdraft was decreased to $2,896. The chancellor could well conclude that the money from the notes was used to lessen the overdraft. The bank must have known that J. Warren and his corporation were in a precarious financial condition. It would naturally be ready to help its customer of long standing, and good business would make it solicitous in obtaining security for a large debt owing by an embarrassed debtor. The overdraft was lessened by the notes, the money used therefor being secured to the bank by plaintiffs' real estate. It changed an unsecured debt into a secured one.

While J. Warren's unsworn statement (which the bank's president filed with his deposition) contradicts the evidence of plaintiffs, we can give it no weight. No opportunity was given for cross-examination. It appears that the bank started to take his deposition, but he refused to testify, "blowing up," according to the bank's president, because he was handed his statement in writing before he began to testify, and saying that the bank's officers were fully acquainted with what should be done with the money realized from the notes here involved. His evidence was of much importance to sustain the bank's contention that the transaction was a sale of stock and not a loan for the benefit of J. Warren; and that if a loan, it was made for the purpose solely of helping a kinsman in forwarding his business venture, and not because of any representations on the part of the bank. Where a litigant has an available witness whose testimony is material and important to sustain his contentions and fails to summon and examine him, the presumption is that the evidence of such witness, if given, would be adverse to him. *Union Trust Co.* v. *McClelland,* 40 W. Va. 405; *Altavista Cotton Mills* v. *Lane,* 133 Va. 1. It is argued that J. Warren was plaintiffs' agent in securing the loans, and that they were bound by his representations to the bank that the loans were for the purpose of pur-

chasing stock. While no express agency in that regard is shown, it is argued that the bank was justified in presuming it from the prior conduct of the Millers. J. M. Miller had on one occasion, the month previous, executed his note for $5,-000 to the bank, which transaction was negotiated by J. Warren. But this would not constitute a "habit and course of dealing" within the principle announced in *Fielder* v. *Construction Co.*, 63 W. Va. 459, cited by appellants. No loans had ever been made to John G. or Nora Baum Miller. Even if we can say that an agency existed for this particular transaction, we cannot forget the fact that the loans inured to the benefit of the bank, and would not have been consummated if the true financial status of J. Warren with the bank had not been misrepresented. The bank in that regard was acting for itself.

Another important fact remains. The corporation failed and went into bankruptcy in the summer of 1925. J. M. and John G. Miller were in Texas at the time. They returned on August 15, 1925, and learned of the failure. They, in the firm name, filed their claim for produce furnished the bankrupt corporation, but did not set up a claim against it for the amount of the notes. They made partial payments on the notes, and kept the interest paid up until they learned that the representations made by Henking were untrue. Did they ratify the loans and waive the fraud by paying thereon? They say they were relying on J. Warren who assured them (after the failure) that they would be protected. Again, if the loans were made for the benefit of J. Warren, as contended by defendant bank, they had no claim to file against the bankrupt corporation. We do not think the payments on the notes, together with interest, would amount to a waiver of their right to repudiate the transaction upon discovery of fraud which vitiated it. It does not plainly appear that they knew of the fraud when these payments were made. It is elemental law that a waiver of rights must be with full knowledge.

Appellants rely on the proposition that fraud must be distinctly and clearly proven. *Sansom* v. *Wolford*, 60 W. Va. 380. The argument is made that Henking having denied the

making of the representations and the documentary evidence showing a purchase of stock together with the cordial business and blood relationship existing among the Millers and the other facts and circumstances, therefore, the evidence of plaintiffs relative to the representations from memory is not sufficient to justify a finding of fraud. That argument would have been forceful if J. Warren Miller had testified to a sale of stock. A finding of fact by the lower court, carried into decree, will not be sustained where there is a fair preponderance of evidence against it: *Foreman* v. *Roush*, 87 W. Va. 341; *Rice* v. *Rice*, 88 W. Va. 54. But the evidence does not justify the application of that principle.

Cross error is assigned because the decree does not cancel, in its entirety, the note of J. M. Miller for $10,500, and the trust deed securing it. It will be remembered that in the months previous to the execution of this note he had, for accommodation of J. Warren, executed his note for $5,000, and secured it on the same real estate. There is no fraud charged in the execution of that note, which was surrendered to him after the $10,500 note was executed. The fraud in the latter note vitiated only the excess of the first note. The good was merged in the bad, and it would be inequitable to allow him to escape payment of his unquestioned obligation. There was no error in requiring him to pay it.

We do not think the decree is against the plain preponderance of the evidence, and it is affirmed.
                                                        *Affirmed.*